WHALER MOTOR INN, INC. *vs.* RICHARD H. PARSONS.

Bristol.   February 21, 1974. — July 31, 1974.

Present: ROSE, GOODMAN, & GRANT, JJ.

*Landlord and Tenant,* Construction of lease, Lessee's duty to repair.

Provisions in a lease of a sewage pumping station requiring the lessee to keep the premises in the condition in which they were at the commencement of the lease term and the lessor to provide ordinary maintenance, although obligating the lessee to make major repairs, were not breached by the lessee's failure to repair extensive damage to the station's equipment where the damage occurred after the parties had orally agreed to a lease of the pumping station but before the written lease agreement was executed. [478-482]

BILL IN EQUITY filed in the Superior Court on June 30, 1970.

The suit was heard by *Frank E. Smith*, J., on a master's report.

*Arthur J. Caron, Jr.*, for the defendant.

*Edward F. Newell* for the plaintiff.

Rose, J.    This is a suit in equity brought to restrain the defendant from repossessing certain property which had been leased to the plaintiff and to secure an adjudication of the parties' rights in the property.    A judge of the Superior Court decreed that the lease in question was in full force and effect and confirmed the plaintiff's right to use the leased property.    The defendant has appealed.

The suit was referred to a master who made findings of fact as follows: The plaintiff corporation owns and operates a Holiday Inn located on Hathaway Road in New Bedford.    The defendant, who served for a time as the plaintiff's president and as one of its directors, owns other commercial properties in the immediate area.    Both the inn and certain of the defendant's properties are serviced by a single, privately owned sewage pumping station.    The station is located on land owned by the defendant but was constructed at the plaintiff's expense.

On September 8, 1969, the defendant resigned his official positions with the plaintiff and entered into an agreement to sell his stock back to the corporation.    On the same day the defendant informed a number of the plaintiff's officers and directors that he had title to the land on which the pumping station was built; the plaintiff thereupon agreed to lease the station from him. The parties referred the matter of drafting a formal lease agreement to their attorneys.

As of September 8 the station was operating normally, but two weeks later, on September 24, one of its pumps malfunctioned, flooding the station and preventing its further operation.    The defendant hired a local electrician to carry out emergency repairs, which consisted of pumping out and cleaning the interior of the station, dismantling one of the two pumps for cleaning and replacing the other of them, dismantling and cleaning the control panel, and installing temporary electrical wiring

to make the station operational. The defendant refused to authorize any permanent repairs, however, informing the electrician that that decision lay with the plaintiff.

On October 1 the parties entered into a lease agreement by which the plaintiff leased the pumping station for ninety-nine years for the total sum of one dollar. The lease provided in substance that the plaintiff would be allowed to use the station in return for providing electric power and for allowing the defendant to maintain existing sewerage connections and to add new connections free of charge. The provisions which define the parties' duties of repair under the lease are set forth in the margin.[1]

The plaintiff received the electrician's bill for the temporary repairs in January or February of 1970 but refused to pay it, contending that these repairs were the defendant's responsibility. Between October 1, 1969, and June 16, 1970, the station went out of operation eight times due to the vulnerability of the temporary electrical wiring. In each instance, pumping service for the defendant's properties was interrupted, and he was forced to arrange for repairs or perform them himself.

On June 8, 1970, the city of New Bedford notified the electrician who had installed the temporary wiring at the station that permanent repairs would have to be made within five days. After learning of this warning, the plaintiff authorized the electrician to complete his repair

---

[1] "[T]he Lessee does hereby covenant with the Lessor that the Lessee . . . will keep all and singular the said premises in such repair, order and condition as the same are in at the commencement of said term, or may be put in during the continuance thereof, reasonable use and wear . . . alone excepted.

\*       \*       \*

"Anything herein to the contrary notwithstanding, Lessor agrees, free of charge, to operate the said pumping station during the term hereof, including, but not limited to, lubricating the machinery, cleaning filters, checking the equipment, making ordinary, minor repairs and maintenance and generally to inspect and oversee the proper operation of the equipment."

work and subsequently paid for the repairs performed in September of 1969 and in June and July of 1970. During this period, the plaintiff corporation brought an unrelated suit against the defendant alleging that he had committed wrongful acts[2] while serving as its president; on June 2, 1970, in connection with that suit, the defendant was restrained from disposing of his stock in the plaintiff corporation, and on June 15, as part of the same proceedings, the defendant's real estate was attached by the plaintiff. On the following day, June 16, the defendant notified the plaintiff that he was terminating the lease for breach of the lease covenants and of a 1967 agreement between the defendant and the city of New Bedford which was incorporated in the lease.[3]

The "order for decree" confirmed the master's report and, after making somewhat ambiguous rulings as to the parties' duty of repair under the lease,[4] concluded that the lease remained in full force and effect. The final decree repeated this conclusion.

We do not understand the defendant to challenge the master's subsidiary findings which, in the absence of a

---

[2] The allegations in this earlier suit between the parties are not set out in detail by the master. They are, in any event, immaterial to a resolution of the issues in the case at bar.

[3] The defendant was apparently referring to covenants concerning the lessee's duty of repair (set forth in n. 1) and to a provision by which the plaintiff assumed the defendant's obligation, under the agreement with the city, to "maintain" the pumping station and related sewer mains.

[4] The judge ruled in his order for decree that "the last paragraph of the lease puts the burden of repair on the lessor." However, he went on to rule that "[e]quity does not favor forfeiture of a lease, as a general rule, even where the tenant has breached a covenant wilfully, so long as an unreasonable hardship was not imposed on the lessor. . . . [T]he lessee could have understood from the lease that the lessor had the obligation of repair. Therefore, the failure of the lessee . . . to contract for permanent repairs can hardly be termed wilful."

report of the evidence, must stand unless they are mutually inconsistent, contradictory or plainly wrong. *Lucey* v. *Hero Intl. Corp.* 361 Mass. 569, 571 (1972). The defendant argues, however, that the judge erred in the rulings of law which formed the basis for his final decree.

The provisions of the lease which define the parties' duties of repair (see n. 1) are to be read together (*Codman* v. *Hygrade Food Products Corp.* 295 Mass. 195, 199 [1936]) so as to accord them their "natural and reasonable meaning in . . . light of the facts to which they apply." *Boston Molasses Co.* v. *Molasses Distrib. Corp.* 274 Mass. 589, 594 (1931). Interpreting the lease in light of these principles, we conclude that the responsibility for repair is intended to be divided between the parties. The plaintiff, as lessee, is responsible for major repairs, since it is required to keep the property in the condition in which it existed at the commencement of the lease term. The defendant, as lessor, is bound to perform ordinary minor repairs in the nature of maintenance. Such a division of responsibility is consistent with the purpose of the lease, which is to create a framework for joint use of the pumping station by the parties, and has the further virtue of giving effect to both the repair provisions in the lease.

Plainly, an accident which causes extensive flooding and damage to the station's equipment and requires the replacement of one of the station's two pumps requires more than "ordinary, minor repairs" and would normally be the responsibility of the plaintiff as the lessee. In this case, however, the plaintiff's obligation was limited to maintaining the station in the condition in which it existed at the beginning of the lease term,[5] which was found by the master to be October 1, 1969. The mal-

---

[5] The lessee was further obligated to maintain the station in "such . . . condition . . . [as it might] be put in during the continuance . . . [of the term]," a provision not relevant on the facts of this case.

function which is at the root of the present dispute occurred on September 24. The master found that on October 1 the station was operating with a single pump and a temporary electrical connection. It would appear, therefore, that the lease did not obligate the plaintiff to make the repairs called for here.

The defendant attaches significance to the master's finding that the parties agreed to a lease of the station on September 8, before the malfunction occurred; it is his contention that the plaintiff's duty to repair arose on that date. The record, however, does not indicate that the agreement was in writing, and " [i]t is firmly established in this Commonwealth . . . that an oral agreement to create . . . a lease is not enforceable." *O'Brien* v. *Hurley* 331 Mass. 172, 176 (1954), cert. den. 350 U. S. 940 (1956). Therefore, we do not reach the further question whether the terms of the September 8 "agreement" were sufficiently definite to create a lease and to impose a duty of repair upon the plaintiff. See *Riedel* v. *Plymouth Redevelopment Authy.* 354 Mass. 664, 665-666 (1968); *Taylan Realty Co.* v. *The Student Book Exch. Inc.* 354 Mass. 777 (1968).

We hold that the plaintiff did not commit a breach of the terms of the lease by failing to make permanent repairs to the pumping station before June of 1970. No other breach of the lease covenants having been established, the defendant was not entitled to terminate the lease, and its provisions remain in full force and effect.

*Decree affirmed.*