van Gestel, J.
This matter is before the Court on motions for summary judgment by the plaintiff, Shawmut-Canton, LLC (“Shawmut”), and the third-party defendant Mark Kisiel (“Kisiel”) on Shawmut’s complaint and to dismiss the counterclaims of the defendant, Great Spring Waters of America, Inc. (“Great Spring Waters”). It is also before the Court on the motion for summary judgment of the other third-party defendant Grubb & Ellis of New England, Inc. (“Grubb & Ellis”) seeking to dismiss Great Spring Waters’ third-party claims against it.[1]
BACKGROUND
This case involves a lease transaction between and among exceptionally sophisticated parties on all sides.
Shawmut, a limited liability company, owns a building located at 120 Shawmut Road, Canton, Massachusetts, (the “Building”) which contains 67,200 rentable square feet.
Great Spring Waters is a corporation which is part of the Perrier Group of America. It, like others in the Perrier Group, is in the business of bottling, distributing and selling water products.
In April of 1999, Shawmut showed 33,600 rentable square feet of the Building to Diane Petra (“Petra”), the Real Estate Transaction Manager for Great Spring Waters. Petra was accompanied by and assisted by Great Spring Waters’ own broker, William Twomey ("Twomey”), of Fallon Hines and O’Connor, a Trammel Crow Company.
Grubb & Ellis, acting through Kisiel, served as Shawmut’s broker in the transaction. Indeed, it appears that Kisiel had some ownership interest in Shawmut himself.
Following three months of due diligence and various negotiations, at the end of July 1999, Great Spring Waters executed a lease (the “Lease”) for the Building. The Lease was thereafter signed by Shawmut on August 4, 1999. Before its execution the Lease was reviewed by Petra and by Great Spring Waters’ attorneys.
The initial Lease term was for ten years, commencing on February 1, 2000, with two options to extend for five years each. Rent for the first five years was at a rate of $26,040 per month, and for the next five years the rent would increase to $28,840 per month.
The “permitted uses” of the Building by Great Spring Waters were stated in Section 1.2 of the Lease to be: “General warehouse and storage facility uses and office uses incidental thereto ...”
Shawmut, at its own expense, was required by Section 4.2 of the Lease to do certain build-out work on the Building according to plans exhibited as part of the Lease. Subject to those obligations, Section 4.2 provides:
the Premises are being delivered and leased in their condition “as is” without any representation or warranty by Landlord . . . Tenant acknowledges that it has inspected the Premises and has found the same to be satisfactory for their intended uses.
In Section 5.1(b)(iii) the Lease provides in part:
Tenant shall, in its use of the Premises, maintain in full force and effect all permits required by, and comply with the requirements of all applicable governmental laws, rules and regulations.
In Section 7.2 the Lease provides in part:
Without limitation, Tenant shall continually during the term of this Lease maintain the Premises in accordance with all laws, codes and ordinances from time to time in effect, and all directions, rules and regulations of the proper officers of governmental agencies having jurisdiction, and of the Boston Board of Fire Underwriters, and shall, at Tenant’s own expense, obtain all permits, licenses and the like required by law.
Section 14.13 provides in its entirety:
The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document shall become effective and binding only upon the execution and delivery hereof by both the Landlord and Tenant. All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and this Lease expressly supersedes any proposals or other written documents relating thereto. This Lease may be modified or altered only by written agreement between Landlord and Tenant and no act or omission of any employee or agent of Landlord or Tenant shall alter, change or modify any of the provisions hereof.
Section 14.23 provides that the Lease shall be governed exclusively by the laws of the Commonwealth of Massachusetts.
*242 Included on Exhibit TP as part of the build-out by Landlord required in Section 4.2 is the following:
Provide separate approximate 20’ x 30’ room: fleet shop-complete with two internal double door width access, as shown on EXHIBIT “TP" Floor Plan Layout. Landlord will incorporate PGA’s fleet shop specifications whenever possible.
After the Lease was executed, problems arose with the “fleet shop” and the Town of Canton Zoning Bylaws. It seems that such a facility is not permitted as of right in the area where the Building was located. The parties then started down the road seeking a special permit or other approval from the Town of Canton for the fleet shop. The process went so far as a hearing before the Canton Zoning Board of Appeals on November 18, 1999, seeking a special permit for the fleet shop. Then, apparently because Great Spring Waters doubted the ultimate success of the outcome, on December 16, 1999, the attorney engaged for the special permit process was told by Great Spring Waters to “withdraw the petition for a special permit for a Fleet Maintenance Shop on Shawmut Rd.” Thus, there never was a determination by the Canton Zoning Board of Appeals on the issue of a special permit.
Also on December 16, 1999, Great Spring Waters sent by facsimile and Airborne Express a letter to Shawmut announcing its “decision to cancel the lease with [Shawmut] effective immediately.” The basis for the cancellation was said in the letter to be delay in delivery of the facility and the fact that the Town of Canton “will not grant the needed approvals for this facility.”
Great Spring Waters claims that it relied on representations of Kisiel that there would be no problems with its intended use of the Building, based on the zoning by-laws of the Town of Canton.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. Rule 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The motions’ resolutions here depend to a great degree upon a proper interpretation of the language of the Lease itself. These are questions of law for the Court. Lumber Mut. Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). “In the absence of an ambiguity, [the Court] will ‘construe the words of the [Lease] in their usual and ordinary sense.’ " 116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001). The mere fact that parties disagree on the proper construction of Lease language does not necessarily establish an ambiguity. Lumbermans Mut. Cas. Comp. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
The Lease is, however, to be read in light of the circumstances of its execution, which may enable a Court to see whether its words can be understood or are actually ambiguous. Robert Industries, Inc. v. Spence, 362 Mass. 751, 753 (1973). Different provisions of a lease dealing with the same subject matter must be read together, however, and, if possible, the language should be given a reasonable construction. Markey v. Smith, 301 Mass. 64, 70 (1938); Codman v. Hygrade Food Products Corp. of New York, 295 Mass. 195, 199 (1936); Whaler Motor Inn, Inc. v. Parsons, 2 Mass.App.Ct. 477, 481 (1974).
When an element of ambiguity does appear in a lease, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the [Court] is to construe the [Lease] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the Lease as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written lease. City of Haverhill v. George Bronx Inc., 47 Mass.App.Ct. 717, 720 (1999).
Significantly here, the parties are extremely sophisticated in the matters in issue. Thus, here, perhaps more than in situations in which there is a disparity in bargaining power or a general lack of sophistication about the matter at hand, where knowledgeable and fully represented parties choose to embody their relationship in a detailed and carefully crafted written instrument, they are entitled to and should be held to the language they chose. The Court should be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument that are specifically anticipated and addressed within the Lease overwhelm or change the document itself. “Courts cannot. . . [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
*243 The Court must begin with an assessment of the effect of the Lease’s integration clause. As noted above, it reads:
The submission of this document for examination and negotiation does not constitute an offer to .lease, or a reservation of, or option for, the Premises, and this document shall become effective and binding only upon the execution and delivery hereof by both the Landlord and Tenant. All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and this Lease expressly supersedes any proposals or other written documents relating thereto. This Lease may be modified or altered only by written agreement between Landlord and Tenant and no act or omission of any employee or agent of Landlord or Tenant shall alter, change or modify any of the provisions hereof.
(Emphasis added.)
Knowledgeable real estate people, and their skilled attorneys, know exactly what those words mean. None of the parties is relying on anything regarding the Lease except for what is written therein. Specifically, they intend by that language to eliminate, as much as words can do, any uncertainties or situations affecting the Lease that anything prior to its execution might cause. And in this array of eliminated things are “representations” of any and all kinds, intentional or negligent. There is no other reason for including such language in the Lease; and if it is to be given no meaning by the Court, then the Bar is entitled to know that before, not after, clients are advised to include it in their documents.
The Supreme Judicial Court in Bates v. Southgate, 308 Mass. 170, 182 (1941), held that “contracts or clauses attempting to protect a party against the consequences of his own fraud are against public policy and void where fraud inducing the contract is shown . . .’’In Bates a stock broker purchased certain shares of stock from another brokerage house and shortly thereafter received a confirmation slip reciting, among other things, “in making this transaction, we make no representation other than to identify the security and state the price.” Bates was familiar with such confirmation slips and, in fact, used them himself with his own customers. There was evidence from which the jury could — and apparently did — find that there was fraud inducing Bates to buy the stock from Southgate and Company.
Near the end of the Bates opinion, at p. 183, the court said: “Nothing herein said affects any evidential value of exculpatory clauses or agreements as tending to show that no extraneous representations were in fact made, or if made that they were not relied upon.”
Nearly 60 years later, the Appeals Court in Sound Techniques, Inc. v. Hoffman, 50 Mass.App.Ct. 425 (2000), wrestled with the extent and reach of the Bates holding. In Sound Techniques the Appeals Court drew a distinction between negligent rather than deliberate misrepresentation. In reaching its determination to enforce the integration clause, the Appeals Court said, at pp. 433-34:
There is nothing in the evidence before us that shows or even suggests that the integrity of the bargaining process was tainted by illegality, fraud, duress, unconscionability, or any other invalidating cause. The lease was not a contract of adhesion . . . Nothing suggests that the bargaining powers of the parties were unequal. Indeed, the evidence showed that [the plaintiff] was represented by counsel throughout the negotiation process and its acceptance of the lease was conditioned upon an inspection by an [expert] that was in fact conducted. Based upon the evidence presented and the public policy of this Commonwealth, there is no reasonable basis for ignoring the plain language of the merger clause, in which [the plaintiff] agreed that it was entering the contract free from influence by or in reliance upon any representations other than those set out in the contract.
It would be hard to find a situation much closer to that before the Court here than what was before the Appeals Court in Sound Techniques.
Perhaps significantly, the Appeals Court in Sound Techniques, in footnote 11, recited that that court “expressly [left] for another day those situations involving, among others, consumers, a gross disparity in the bargaining positions of the parties, or unconscionable contract clauses.” The decision, therefore, seems to confirm that when the bargaining positions are equal and there is nothing unconscionable in the integration clause, then the parties’ choice of such a clause ought to be honored.
This Court agrees.
Sophisticated business people, represented by experienced counsel, cannot expect to set forth their agreement in a detailed Lease that, among other things, affirms that the parties are relying upon the document as drafted, and nothing more, and then, when things do not work out as they might like, seek refuge in an argument that there was fraud in the inducement. The business community wants certainty in their agreements. If the participants say that there is nothing outside the four corners of the Lease that matters, they are entitled, and bound, to live by that agreement.
Unlike Bates, this case is not one in which one side to the transaction is attempting to avoid its fraud by a disclaimer in a confirmation notice. Rather, both sides have averred that they did not rely upon anything represented by the other side, but agree solely to what they have recited in their detailed written Lease. It is important for the contracting community to know that what they say in their agreements will *244 have meaning and will be enforced. Thus, there is a breach of the Lease by Great Spring Waters.
Whatever Mr. Kisiel may have suggested about the Canton zoning situation here, Great Spring Waters said, in the Lease which it executed, that it was only what was recited in that document upon which it relied. This is one of those situations wherein a party’s alleged reliance on a representation presents an issue of law for the Court to decide. See, e.g., Cataldo Ambulance Service, Inc. v. Chelsea, 426 Mass. 383, 387 (1998). There is, therefore, no basis for any of the counterclaims or third-party claims against Shawmut or Kisiel.
Given Great Spring Waters’ choice of Lease language, it cannot be said that Shawmut’s conduct fell “within at least a penumbra of some common-law, statutory or other established concept of unfairness ... or is immoral, unethical, oppressive or unscrupulous." Massachusetts Farm Bureau Fed'n, Inc. v. Blue Cross of Massachusetts, 403 Mass. 722, 730 (1989). There is, thus, no c. 93A violation here.
This is the result of the claims between the principal parties to this situation and Great Spring Waters’ claims against the third-party defendant Kisiel.
Also among the third-party defendants is Grubb & Ellis. Its sole connection to this case is that it acted as the listing broker for Shawmut. Great Spring Waters’ claims against Grubb & Ellis are, like those against Shawmut and Kisiel, for deceit, negligent misrepresentation, promissory estoppel and violation of G.L.c. 93A.[2] These claims all rest upon the theory that Kisiel made false representations to Great Spring Waters regarding the Canton zoning situation. But, as noted above, there being no reliance by Great Spring Waters on any representations by Kisiel or whomever he represented, there can be no basis for any of the claims against Grubb & Ellis.
ORDER
For all of the foregoing reasons, the motions for summary judgment of Shawmut-Canton LLC, Mark Kisiel and Grubb & Ellis of New England, Inc. are ALLOWED.
Liability having been determined in favor, among others, of the plaintiff, the parties are requested to advise the Court as to how they intend to proceed regarding damages. Will discovery be required? Does the Building remain vacant? Can a number be agreed upon between Shawmut and Great Spring Waters? Would mediation help? The Court hereby schedules a status conference for these purposes for January 8, 2002, at 2:00 p.m.

 Nhe progress of this matter has been somewhat slowed because of a proceeding in the Commonwealth Court of Pennsylvania in a case docketed there as Insurance Commissioner v. Reliance Insurance Company, 269 MD 2001. Reliance Insurance Company is the insurance carrier for Grubb & Ellis. Reliance is in some kind of “rehabilitation” proceeding in Pennsylvania, and the Pennsylvania court has asked courts elsewhere to give comity to its order staying proceedings that might affect Reliance. This Court did so. This Court has, however, recently been advised by counsel for Grubb & Ellis that it may proceed with its decisions on the pending summary judgment motions, with further proceedings thereon depending upon the outcome thereof; e.g., if the motions are allowed, there will be no adverse effect on the Pennsylvania rehabilitation of Reliance. If, however, the motions are denied, at least insofar as Grubb & Ellis is concerned, there may have to be communication with the Pennsylvania court before proceeding further.

 The counterclaim also includes what is called Count V, seeking relief pursuant to G.L.c. 231, Sec. 6F. This statute does not really create a cause of action such as would support a count in a complaint or counterclaim. Rather, it focuses on the conduct of the litigation, not on conduct prior thereto. See, e.g., Lewis v. Emerson, 391 Mass. 517, 525-26 (1984). In any event, given the results here, there certainly was nothing insubstantial, frivolous or advanced other than in good faith by Shawmut, Kisiel or Grubb & Ellis.